# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

MICHELLE L. RITTENHOUSE,

       Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

No. C10-4062-PAZ

**MEMORANDUM OPINION AND
ORDER**

---

## *Introduction*

This matter is before the court for judicial review of a decision by an administrative law judge ("ALJ") denying the plaintiff's applications for Disability Insurance benefits ("DI") under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Act. The plaintiff Michelle L. Rittenhouse claims the ALJ erred in finding that the record does not contain objective clinical findings supporting her impairments, in failing to give appropriate weight to the results of her Functional Capacity Evaluation and the opinions of the evaluator, and in failing to give appropriate weight to the opinion of a mental health evaluator that she suffers from depression.

Rittenhouse filed her applications on November 18, 2005, alleging a disability onset date of July 8, 2002. Her claims were denied initially and on reconsideration. She filed a request for hearing, and a hearing was held on July 11, 2007, before an ALJ. Rittenhouse was represented by an attorney at the hearing. Rittenhouse and a vocational expert ("VE") testified. On September 22, 2007, the ALJ issued his decision, finding that although Rittenhouse has severe impairments consisting of rheumatoid arthritis and bilateral carpal tunnel syndrome, her impairments do not reach the Listing level of

severity.  The ALJ found Rittenhouse is unable to return to her past relevant work as a seamstress, and she also cannot perform the full range of light work.  However, he found Rittenhouse has the residual functional capacity to perform work that exists in significant numbers in the national economy, such as parking lot attendant and cashier II.  He therefore concluded Rittenhouse is not disabled.

Some two years after Rittenhouse requested review, the Appeals Council issued its decision denying her request, making the ALJ's decision the final decision of the Commissioner.

Rittenhouse filed a timely Complaint in this court, seeking judicial review of the ALJ's decision.  On September 8, 2010, with the parties' consent, Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment.  The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The court must decide whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence based on a review of the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted).  In this deferential review, the court will consider the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion.  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006). The court first will summarize the testimony at the ALJ hearing, and the other evidence in the Record.

### *Hearing Testimony*

At the time of the ALJ hearing, Rittenhouse was forty-five years old.  She lived with a housemate in Spencer, Iowa.  She has two children, ages 19 and 21, neither of whom lived with her.  She went through the eleventh grade in high school, and then got

a G.E.D. She has had no formal education beyond high school. She is 5'7" tall and weighed about 187 pounds at the time of the hearing.

Rittenhouse worked from November 2001 to June 2003, as a cook at a cafe in Spencer. From 1998 to 2001, she operated an industrial sewing machine at a company that manufactures firefighters' uniforms. From 1997 to 1998, she worked as assistant manager at a Dollar Store, where she did payroll, stocked shelves, ran the cash register, and opened and closed the store.

Rittenhouse described herself as "very healthy" until July 2002, when she began having "lots of pains and discomfort." Kenneth R. Hunziker, M.D., her treating physician, diagnosed her with overuse syndrome of the wrists with possible carpal tunnel syndrome. She underwent some physical therapy and was given braces to wear on her hands, but the braces actually intensified her pain and stiffness. While she was being treated for the pain in her hands, she also began having pain and stiffness in her knees and ankles, making it difficult for her to walk. The doctor performed additional tests and diagnosed Rittenhouse with rheumatoid arthritis. He prescribed prednisone, and referred her to a specialist, Haraldine Stafford, M.D., at the University of Iowa Hospitals and Clinics.

Before Rittenhouse first saw Dr. Stafford in January 2003, she began having problematic side effects from the steroids. They made her "swell up," kept her awake at night, and then she began having stomach problems. According to Rittenhouse, Dr. Hunziker told her the steroids were lowering her immune system, making her more prone to illness. She stated the prednisone was "eating [her] stomach." Nevertheless, at the time, prednisone was the only effective medication available to treat her, so she continued to take the medication for three-and-a-half years, despite the ongoing adverse side effects. She continued to be subject to frequent illness, developing bronchitis, weight gain, and diminished appetite.

Rittenhouse began having more and more difficulty performing her duties at work. In her cooking job, she did prep work involving cutting up vegetables, peeling potatoes, and the like, and then she had duties as a fry cook. These tasks required frequent gripping and frequent use of her hands and fingers. She eventually reached the point where she was no longer able to perform all of her duties at work on a regular basis, and her absences due to her symptoms increased to the point that her employment was terminated. Dr. Stafford encouraged her to do as much as she was able, but Rittenhouse does not believe she could return to any of her past jobs due to the movement and repetitive motions involved.

Rittenhouse has not worked since losing her job at the cafe. She drew unemployment for a few months, and looked for work during that time, but she never had any interviews or offers. She gets food stamps, and she is allowed to live in a friend's house rent-free. In response to the ALJ's questioning, she indicated she also was fired from her jobs at Dollar General and the clothing manufacturer due to attendance problems.

Rittenhouse does not sleep well, which leaves her very tired throughout the day. She stated that her pain and stiffness make it difficult to get into a comfortable position in which to sleep. Her pain and stiffness are at their worst when she first arises in the morning. She forces herself to get up and move around, and after two to three hours, the pain and stiffness have lessened to the point that she can get dressed and move around the house. She estimated she can sit for no longer than twenty to thirty minutes at a time before she has to get up and move around or change position.

She no longer takes prednisone, and instead is treated with sulfasalazine, an anti-inflammatory and immunomodulatory agent; methotrexate, an antimetabolite; and Humira, a medication administered by subcutaneous injection. She stated the drugs cause ulcerations in her stomach, as well as shortness of breath, asthmatic symptoms, and chronic bronchitis. When she climbs stairs, walks, does laundry, bends, lifts, or exerts herself at all, she gets short of breath and dizzy. Stopping the activity will relieve the

symptoms. She estimated she could walk about half a block before becoming short of breath and having to rest. She is a smoker, having smoked for twenty-five years, but she stated that her smoking had decreased over the year prior to the ALJ hearing to only one or two cigarettes a day.

Rittenhouse underwent a Functional Capacity Evaluation (FCE). She stated she did her "very best" on the tests and activities. The next day, she could hardly get out of bed. She also saw psychiatrist Paul D. Anderson, D.O. for an evaluation. He prescribed Seroquel to help her sleep, and opined that if she got adequate sleep, her pain and stiffness might improve somewhat. She stated the Seroquel will make her sleep for ten to twelve hours, and the next day, she feels even more tired, drowsy, and light headed, so she only takes the medication about once a week.

Rittenhouse is not receiving any type of treatment for carpal tunnel syndrome other than wearing wrist braces occasionally. She has not been advised to have surgery or undergo further treatment for the condition.

### *Rittenhouse's Medical History*

On April 9, 2002, Rittenhouse saw a doctor with complaints of increasing wrist and arm pain for about three weeks. She had been peeling potatoes by hand, and stated that at night, her hands felt "thick, full and tingly" and achy. R. 284. She had been working at a cafe for six months with no problems until three to four weeks previously. On examination, Rittenhouse exhibited discomfort with forceful gripping. She had a positive tinsel sign with "shooting pain down across the dorsal aspect of her hand," and discomfort with inward forceful flexion. Her hands, especially the right hand, seemed "thicker and a bit swollen." *Id.* Rittenhouse also reported "that her right hand is in a claw like position after she has been working in the daytime." *Id.* She did not want to cut her work hours for financial reasons. She was diagnosed with possible carpal tunnel on the right, and she

was given a brace for her right wrist. She was directed to use cool compresses when she got home from work, and to take Ibuprofen 600 mg for pain.

On May 20, 2002, Rittenhouse saw a doctor complaining of a two-month history of aching joints throughout her body, with occasional swelling and numbness. She reported that the pain had "gotten to the point where she is depressed about it and she gets irritable and moody when she is in quite a bit of pain." R. 279. The doctor prescribed Naprosyn and ordered an arthritis panel. Rittenhouse was encouraged to stop smoking.

On May 24, 2002, the doctor called Rittenhouse with the results of her lab work. She had a positive rheumatoid factor that was noted to be "rather high." *Id.* Rittenhouse reportedly was "doing well on the Naprosyn," and her "pain ha[d] significantly improved with regular use of this." *Id.* She was directed to follow up in two months.

On July 15, 2002, Rittenhouse saw Dr. Hunziker "to discuss the stiffness in her wrist." She had been seen in the emergency room a few days earlier for soreness in her wrist, and was treated with Tylenol with Codeine. Notes indicate Rittenhouse had been given a carpal tunnel brace "in the spring," but the brace had not resolved her wrist pain. On examination, Rittenhouse's left wrist appeared to be "fairly normal," while the right wrist had "a little swelling of the tendons." R. 278. Rittenhouse also stated that her right hand, particularly the third and fourth fingers, were swollen, stiff, and sore when she got off work at night. Her knees and ankles appeared normal. The doctor prescribed prednisone 10 mg twice daily for two weeks, then 5 mg twice daily. He directed her to return for follow-up in one month, but she did not see the doctor again for nearly six months.

On January 1, 2003, Rittenhouse underwent a Functional Capacity Evaluation (FCE) by Occupational Therapist Dave Noeldner at the Buena Vista Regional Medical Center in Storm Lake, Iowa. Rittenhouse exhibited normal posture, gait pattern, and balance. Her range of motion was within normal limits for all joints and planes of

movement. She had normal grip and pinch, but she reported increased pain in her wrists and fingers with repetitive lifting or repetitive hand use. The evaluator opined she would be able to perform grasping and pinching on an occasional basis, but she would be unable to "perform repetitive work such as in an industrial or assembly setting." R. 343. She could use hand tools, but again, not on a repetitive basis. She could sit or stand for about forty-five minutes before having to change position, which would rule out small parts assembly or factory production work. She could lift occasionally, but the evaluator noted this likely would increase the pain in her wrists, hands, and ankles. He recommended that her lifting below or above waist level be only occasional, with no more than one repetition every half hour. He further noted that her "compromised lung capacity would also verify this as her oxygen sats decreased to 91% at the end of the floor lifting and during the squat work activity. Below 90% is of great concern." *Id.* The results of her testing indicated "a current work capacity characterized by the Sedentary Light Physical Demand Level for work above the waist and the Medium Light Physical Demand Level for work below the waist." R. 342.

The next time Rittenhouse saw Dr. Hunziker was on January 7, 2003. She complained of stiffness and soreness in some of her joints, and stated she sometimes could hardly get up in the morning. She stated she had stiffness and soreness in her knees, the left knee more than the right. On examination, her hands appeared to be puffy and her wrists appeared swollen. The doctor also noted some heat and warmth in her left knee. He diagnosed probable rheumatoid arthritis. He referred her to a rheumatologist in Iowa City, noting that he did not feel comfortable starting her on a disease modifying agent himself without consultation from a specialist.

On January 16, 2003, Rittenhouse saw Haraldine A. Stafford, Ph.D., M.D., a rheumatologist in Iowa City. On January 28, 2003, Dr. Hunziker reviewed with Rittenhouse a letter resulting from that consultation. Dr. Hunziker's notes indicate the

Iowa City doctors "do in fact believe she has some type of polyarthralgia, some type of collagen disease." R. 275. They prescribed methotrexate and prednisone, and directed Rittenhouse to obtain follow-up blood work.

Rittenhouse saw Dr. Hunziker on June 12, 2003, complaining of increased pain in her right wrist. She had not followed up with blood tests as directed, and she had not returned to Iowa City for follow-up due to lack of funds. On examination, her right wrist was "very swollen, very painful," and "tender to the touch." R. 272. Her right knee was slightly swollen, tender, and warm. The doctor diagnosed an acute flare-up of rheumatoid arthritis. He increased her prednisone to 20 mg daily and her methotrexate to 15 mg weekly, and he ordered liver function, creatinine, and other lab tests. He advised Rittenhouse to have blood counts every two to three months while she was on the methotrexate, and he recommended she return to Iowa City to see the rheumatologist.

On July 1, 2003, Rittenhouse saw Dr. Hunziker for follow-up. Notes indicate she was "doing quite a bit better." She requested Ibuprofen for her pain, stating it was the only thing that worked well for her, and Ultram was too expensive and Darvocet made her sick. The doctor noted Rittenhouse had applied for Title 19, which would allow her to return to Iowa City for follow-up with the rheumatologist. He noted Rittenhouse "really doesn't have enough money for even her medications at this point." R. 268.

Rittenhouse returned for follow-up on July 31, 2003. Notes indicate she was doing "fairly well," and her condition seemed "better than a month ago." *Id.* Her right wrist was worse than her left, and her ankles were bothering her, but her knees and shoulders "seem[ed] to be ok." *Id.* She was seen for an earache on August 14, 2003, and was treated with antibiotics and ear drops. She returned on August 28, 2003, and her condition had not improved. The doctor switched antibiotics.

She saw Dr. Hunziker on September 30, 2003, complaining of swollen joints and feet, and cold knees and ankles. She stated she could not drive or walk due to the pain and

swelling. In addition, her ear infection was still present. She saw the doctor on October 7, 2003. He noted Rittenhouse had been giving herself a dosage of methotrexate that was too low because she had the wrong syringes, so she had been experiencing "a lot of flare up of her disease." In addition, her doctors had tapered her off prednisone, and she was having a lot of joint problems. The doctor switched her over to methotrexate pills, which would be easier for her than the injections, and he put her back on prednisone for a nine-week, decreasing dosage.

Rittenhouse returned to see Dr. Hunziker for follow-up on November 7, 2003. She reportedly was "doing great." Her joints were "much improved," and she was "feeling really good." R. 263. She was seen on December 31, 2003, with "muscle aches, cough, congestion and fever." R. 260. She was diagnosed with an upper respiratory tract infection with bronchitis, and was treated with medications. She returned on January 22, 2004, complaining of sore throat, fever, and swollen glands. She was diagnosed with strep tonsillitis and an ear infection, and was treated with medications. On February 7, 2004, Dr. Hunziker advised Rittenhouse to return to Iowa City for a follow-up with the rheumatologist. She promised to call for an appointment within the next few days.

Notes indicate she continued to have episodes of bronchitis, each infections, and congestion for the next few months. She was seen on June 16, 2004, for evaluation of a scaly rash on her feet, and she was treated with a cream.

On June 14, 2004, Rittenhouse saw Dr. Stafford in Iowa City for follow-up. Notes indicate Rittenhouse's "symptoms were under control and stable." Her methotrexate dosage was increased, and she was placed on a tapering dosage of prednisone. She was referred to Physical Therapy "for back stretching and strengthening exercises and gluteal muscle strengthening exercises," in connection with complaints of mechanical low back pain. R. 303. She was encouraged to take calcium and vitamin D.

On July 14, 2004, Rittenhouse was seen in the emergency room for acute bronchitis. She was treated with medications.

Rittenhouse saw Dr. Hunziker on July 29, 2004, for follow-up of her rheumatoid arthritis. She was "getting along pretty good" on the increased methotrexate dosage and lowered prednisone dosage. The Iowa City doctor also had prescribed Ibuprofen 800 mg three times daily. Overall, Rittenhouse reported "getting along pretty well." She denied any increased problems since the changes in her medications. R. 249.

She was seen on January 19, 2005, with a respiratory infection. She was treated with medications. She was seen on June 24, 2005, for follow-up. She was still having a lot of symptoms from the respiratory infection, but she was "doing very well" with her rheumatoid arthritis. She had been unable to return to Iowa City due to "transportation problems and finances." R. 244. She had been unable to take the Ibuprofen, stating it actually caused an acute flare-up of her arthritis. She saw the doctor again three days later complaining of cough, shortness of breath, and bronchitis, which were not improving on her medications. He prescribed a different antibiotic, a decongestant, and an albuterol inhaler. On February 11, 2005, Rittenhouse called the doctor to complain that she still had a cold and cough. She would feel better for a day, and then her symptoms would return. Her prescription for antibiotics was renewed, with instructions to see the doctor if she did not improve.

Rittenhouse saw the doctor for follow-up on April 27, 2005. Overall, she felt she was "doing pretty well." R. 239A. She still got "some soreness in her hands and shoulders from time to time." *Id*. Her knees and ankles were "good." *Id*. She was directed to return for follow-up in three months.

On May 4, 2005, Rittenhouse again was seen for a cough and sore throat. She was treated with medications. On July 18, 2005, she was diagnosed with a respiratory

infection, and was treated with antibiotics and other medications. On August 2, 2005, she reported that her chest was a little better but not clear. Her medications were refilled.

On September 28, 2005, she saw a physician's assistant in Dr. Huziker's office complaining of right upper quadrant pain. An ultrasound of her gallbladder was ordered. Rittenhouse was seen in the emergency room on October 11, 2005, with a complaint of severe right upper quadrant pain. Notes indicate she had experienced several recent similar episodes. She was put on a morphine PCA pump and IV fluids. She underwent an EGD which revealed several gastric erosions and superficial ulcerations. She was discharged with prescriptions for proton pump inhibitors and Carfate, with a referral to a gastroenterologist in Iowa City. She saw Dr. Hunziker on October 14, 2005, still having abdominal discomfort. She was nauseated and had difficulty eating and keeping food down. The doctor diagnosed gastritis and possible holecystitis. He increased her Protonix dosage and prescribed Bentyl 20 mg for pain. He noted that if her symptoms did not improve in a week, he would repeat liver functions studies and other lab work, and consider a referral to a surgeon. She saw Dr. Hunziker for follow-up on October 19, 2005, and her symptoms had not improved. He noted that her gallbladder workup essentially was negative, but her symptoms still sounded like gallbladder disease. He indicated she probably should get off of prednisone, which could be causing her stomach problems, and he referred her to the rheumatologist.

On November 4, 2005, Dr. Hunziker talked with Dr. Stafford, the rheumatologist in Iowa City. They agreed Rittenhouse should get off the prednisone. They planned a gradual decrease of prednisone, and an increase in the methotrexate. Dr. Hunziker saw Rittenhouse on November 11, 2005, to discuss these recommendations. He noted, "The problem is that [Rittenhouse] is completely broke and has no financial assistance. . . . She . . . actually had to stop her Methotrexate about three weeks ago because of lack of funds." R. 227. He indicated he was going to see if his office could get some help for her

to pay for the medication, noting that if she could not obtain the Methotrexate, she likely would have a "lot of flaring up of her rheumatoid arthritis." *Id.* The doctor further noted that Rittenhouse's abdominal pain was better, and the Protonix was helping. He noted, "I suspect that she had some peptic ulcer disease but again because of the lack of funds we cannot really pursue EGD or other testing at this time." *Id.* The doctor spoke with a Clay County Relief representative who was going to try to arrange for Rittenhouse to be seen again in Iowa City.

Rittenhouse was seen on November 21, 2005, with upper respiratory symptoms. She was diagnosed with a respiratory infection, bronchitis, and pharyngitis, and was treated with medications. She was seen on January 6, 2006, for follow-up. Her antibiotics were refilled, and she was put on a slow taper of prednisone.

On January 31, 2006, Rittenhouse saw Dr. Stafford in Iowa City. She complained of chronic aching in her arms, shoulders, back of her legs, and back, worsening as the day progresses; occasional swelling and pain in her hands, ankles and knees, although this was much improved since her last visit nineteen months earlier; constant, painful trapezius muscles in her neck; paresthesias in the palms and all of the fingers, and occasional locking-up of her fingers; poor sleep due to difficulty finding a comfortable position; mild thinning of her hair; recurrent colds, strep pharyngitis, and bronchitis; and loose bowel movements. Rittenhouse was not exercising regularly. She was not driving, and relied on her mother for transportation. She expressed concern that she could not pay for her medications. On examination, she was noted to be modestly overweight. She exhibited carpal tunnel symptoms with compressions of both wrists, right greater than left. She had full ranges of motion, and although her trapezius muscles were tight to palpation, her neck mobility was "almost normal." R. 295. She had no fibromyalgia tender points and her spine and gait were intact. The doctor reached the following impressions:

1. <u>Seropositive rheumatoid arthritis</u>. She seems fairly well controlled, although she continues to have morning stiffness.

However, her financial situation would now preclude starting any additional medication. I doubt that she would be a candidate for TNF inhibitors given that she gets frequent upper respiratory tract infections, however, this is something to consider in the future, especially if we have her on chronic antibiotics.

2. <u>Myalgias in the shoulder, neck and back</u>. These are not associated with fibromyalgia tender points. It is possible that this is related to tapering off the Prednisone, alternatively may be due to her sleep disturbance. She is deconditioned and does not exercise[ ] regularly.

3. <u>Hand paresthesias</u>. She has evidence of mild sensory carpal tunnel syndrome and would likely benefit from splints.

4. <u>Financial situation</u>. Our head nurse and myself discussed options for her at this point. We advised her that IowaCare will not provide her with any medications and we will try to minimize her medication costs.

5. <u>Widespread rash</u>. This may be related to a contact dermatitis. Needs to be further evaluated.

R. 295. The doctor changed Rittenhouse's methotrexate dosage; prescribed folic acid; referred her to occupational therapy for nocturnal wrist splints; referred her to dermatology for evaluation of her skin rash; and advised her to obtain lab tests.

On February 10, 2006, Laura Griffith, D.O. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. She opined Rittenhouse would be able to lift twenty pounds occasionally and ten pounds frequently; stand/walk and sit for about six hours each in an eight-hour workday; push/pull without limitation; perform all postural activities occasionally except that she should never climb ladders, ropes, scaffolds, etc.; and perform fingering/fine manipulation on a limited basis, but all other manipulative activities without limitation. In reaching her conclusions, Dr. Griffith noted Rittenhouse "does laundry, vacuums and cooks. She p[l]ays with her granddaughter. She has no joint deformity on physical exam." R. 159. She further noted Rittenhouse "has

swelling of her hands on [physical examination]. Fingering is limited bilaterally to frequently." R. 161.

On April 19, 2006, Claude H. Koons, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. He reached identical conclusions to those of Dr. Griffith. Dr. Koons noted Rittenhouse had "mild symptoms of carpal tunnel which may respond well to a brace. [Her rheumatoid arthritis] is fairly well controlled, although she continues to have morning stiffness. She has myalgias in her shoulder, neck and back. These are possibly due to the prednisone taper. It is also noted that she does not exercise regularly and is deconditioned." R. 168.

Rittenhouse saw Dr. Stafford on May 12, 2006, for follow-up. She described her pain at a 4/10, with the most symptoms in her knees, ankles, and hands. She had been completely off prednisone since January 2006. She was experiencing mild to moderate fatigue, and her morning stiffness was lasting about two hours. She had intermittent coughs ands wheezing, but she continued to smoke a pack of cigarettes daily. Her carpal tunnel symptoms were somewhat improved, and she was directed to wear her wrist splints at night to help reduce daytime symptoms. Her medications were continued, and hydroxychloroquine was added.

Rittenhouse saw Dr. Stafford on October 19, 2006, for follow-up of her rheumatoid arthritis. She reported doing fairly well during the summer, but once the weather became cold and wet, she began having increasing pain in her wrists and hands primarily, and sometimes her knees and ankles. Joint pain was worse in the mornings and remained for several hours. She had swelling in her wrists and sometimes her hands, and pain and stiffness in her neck that also was worse in the mornings. On examination, her hand fist formation was intact; her grip strength was about 4.5/5; and she had mild synovitis of the fingers of her right hand, moderate synovitis of her right wrist, and mild synovitis of her left ankle and the toes of both feet. The doctor's impression was that Rittenhouse had

"persistent disease and evidence of erosions on x-ray. She needs more aggressive therapy." R. 317. Due to evidence of a possible Babinski's sign on the left, the doctor was concerned that Rittenhouse's neck pain could be secondary to cervical myelopathy. However, neck x-rays were negative for rheumatoid arthritis of her neck. Instead, the x-rays showed degenerative disc disease, "which is the common form of arthritis." R. 314.

Rittenhouse returned to see Dr. Stafford on March 15, 2007. She rated her pain level at 4/10. She reported that her energy level had improved modestly since she started taking Humira. Her pain and stiffness reportedly had been slower to respond, but Rittenhouse was "optimistic that her gradual improvement will continue." R.309. She continued to have ongoing epigastric discomfort. Protonix was discontinued, and omeprazole was prescribed. On physical examination, her joints showed mild synovitis in both hands and the right wrist; "fairly good" closure and grips; good ranges of motion in her elbows, shoulders, cervical spine, hips, and knees; mild swelling in both ankles and several joints of both feet, with minimal tenderness; and normal gait and stance. The doctor's impression was that Rittenhouse's rheumatoid arthritis symptoms were improving slowly, and she was continued on her current medications except that she was encouraged to stop the naproxen and reduce her methotrexate from 25 mg down to 20 mg once weekly. The doctor suspected the naproxen might be causing Rittenhouse's epigastric symptoms. One of Rittenhouse's liver tests was mildly elevated, and the doctor noted that decreasing the methotrexate would reduce its effect on Rittenhouse's liver and bone marrow, making it safer for her to take.

On May 31, 2007, Rittenhouse saw Paul D. Anderson, D.O., a psychiatrist, for an evaluation. Dr. Anderson noted that his only sources of information for the evaluation were Rittenhouse's self-report and records from the University of Iowa. Rittenhouse complained of some depression due to her constant pain. She reported trouble sleeping, and trouble with her energy and motivation. She had never seen a mental health

professional before in her life. Doctors in Iowa City had tried her on Wellbutrin SR, to help her stop smoking, but Rittenhouse stated "it caused her to cry, become more depressed and emotionally labile so she stopped it." By the time of this evaluation, she had reduced her smoking from a pack a day to five cigarettes a day.

Rittenhouse described her daily activities as follows:

> This patient gets up anywhere between 5 a.m. and 7 a.m. She tries to stretch and do some exercises as she is initially stiff for two hours every morning. She fixes her breakfast and takes her morning medication. She showers, cleans up and dresses for the day. She may do a load of laundry, pick up the house, and then she sits and rests a lot between activities. Her roommate is up around noon as he works nights. She tells me that they take turns making lunch. He goes to work by 3 p.m. She watches TV or sometimes babysits her granddaughter. She generally picks her daughter up from her place of employment around 5 or 6 p.m. She then goes home, eats a light supper and then her son and one grandson may visit. She cleans the kitchen, watches some television and she's generally in bed between 10 p.m. or 11 p.m. and she complains she does not sleep well.

R. 327. During her mental status examination, Rittenhouse made poor eye contact "and she showed psychomotor retardation." *Id.* Dr. Anderson inquired about abuse because of her distant rapport, and learned Rittenhouse had been abused as a child and her current roommate was verbally and physically abusive to her. Otherwise, her examination was normal. Dr. Anderson diagnosed her with depression secondary to her physical condition, and estimated her current GAF at 40.[*]

---

[*]A GAF of 40 , indicates "some impairment in reality testing or communication or major impairment in several areas such as work, family relations, and judgment." *Bartrom v. Apfel*, 234 F.3d 1272 (Table), 2000 WL 1412777, at *1 n.3 (7th Cir. Sept. 20, 2000).

### Vocational Expert's Testimony

The ALJ asked VE Tom Audet to assume an individual of younger age, under fifty years old, with a G.E.D., Rittenhouse's work history, and the work-related limitations Rittenhouse described in her testimony. The VE indicated the inability to do repetitive work with her hands would prevent her from working at the seamstress job or in production assembly, which "tend to get pretty repetitive." He further indicated she could not work as a cook due to problems with gripping and using her hands in that job. He also stated that if Rittenhouse's testimony were considered credible, she would be unable to maintain an eight hours a day, forty-hour work week, particularly if her absentee issues were related to her health condition.

The ALJ next asked the VE to consider an individual with the same age, education, and work experience as Rittenhouse, but with the following limitations as found by the state agency consultant:

> This time, what if a person could occasionally lift and carry 20 pounds, frequently 10 pounds, could stand or walk or sit in each category about six hours of an eight hour day with normal breaks; push/pull is unlimited; postural activities could be performed occasionally except climbing of ladders, ropes or scaffolds that would be precluded. From a manipulative standpoint they do not limit reaching, handling or feeling, they do limit fingering to frequent. Well . . . that's going to rule out constant, is it not? . . . There's no visual or communicative or environmental limitations. Could such a person on this assessment, if accurate and credible, perform any of the claimant's past jobs?

R. 428. The VE responded as follows:

> The seamstress job as indicated in the DOT required frequent handling, reaching and fingers, so it fits within the hypothetical. However, I would disagree with the DOT in that I've seen factory sewers and they tend to perform at the continuous level, so based on my experience I don't think she could do that job. A better fit is to work as some type of sales

17

clerk in a light job where you're not continuously, you might be talking to customers at times, you know, you're going to operate cash registers at times but you're not going to do the repetitive kinds of work that you would do with this. . . . The seamstress, I mean they're going to be running material through that sewing machine pretty much all day long. So I'd say the best fit based on the hypothetical is the sales clerk job.

R. 428-29. In addition, the VE indicated there would be other occupations consistent with the hypothetical, including cashier II, and parking lot attendant.

The ALJ asked the VE to consider an individual with the limitations found by the Functional Capacity Evaluation. He indicated an individual with those limitations could not perform any of Rittenhouse's past work, but could perform other work, again citing the cashier II and parking lot attendant jobs. Again, however, he noted that if Rittenhouse's testimony were considered to be fully credible, she would be unable to work. In particular, he noted her testimony that she was basically unable to function for a day after the functional capacity evaluation.

### *The ALJ's Decision*

The ALJ found Rittenhouse had not engaged in substantial gainful activity since her alleged onset date of July 8, 2002. He found her to have severe impairments consisting of rheumatoid arthritis and bilateral carpal tunnel syndrome, but he further found that these impairments, singly or in combination, did not meet the Listing level of severity. He found her mental impairment to be nonsevere.

The ALJ found Rittenhouse to have the "residual functional capacity to perform light work within the following parameters":

[O]ccasionally lift and/or carry (including upward pulling) 20 pounds and 10 pounds frequently; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; unlimited pushing and/or pulling

18

(including operation of hand and/or foot controls); no postural limitations except for never climbing ladders/ropes or scaffolds; no manipulative limitations except for fingering (fine manipulation) being reduced to frequent; and no visual, communicative or environmental limitations.

R. 23.

The ALJ indicated that if Rittenhouse's testimony were regarded as fully credible, then "a finding of 'disability' would necessarily follow as she described being unable to function or perform work activity throughout any given day at any level of exertion." R. 24-25. However, the ALJ found Rittenhouse's testimony not to be fully credible. He found that her earnings record "does not indicate a sustained work history," noting that her work history has been sporadic, and she has been fired several times for absenteeism, including being fired from jobs before she began experiencing symptoms of rheumatoid arthritis. The ALJ observed that "[s]tanding alone, the claimant's work history would not warrant a denial of her claim, but it is not a positive factor in the evaluation of her subjective complaints." R. 25.

The ALJ observed that Dr. Hunziker often noted Rittenhouse was getting along fairly well, doing well, and even doing "great" in November 2003. He also noted that Dr. Stafford indicated Rittenhouse was doing well on her medication regimen, and the doctor further noted Rittenhouse was deconditioned and would benefit from a regular exercise regimen. Rittenhouse's FCE evaluator found that she could perform work at the sedentary light physical demand level for work above the waist, and the medium light physical demand level for work below the waist. The ALJ found that the FCE evaluator's comments regarding Rittenhouse's inability to perform repetitive work was based on Rittenhouse's subjective complaints, and was belied by the actual test results.

The ALJ also cited numerous inconsistencies between Rittenhouse's subjective complaints and the objective medical evidence. He noted that none of Rittenhouse's treating doctors ever restricted her activities, recommended surgery, or prescribed ongoing

narcotic pain medications. The ALJ concluded that Rittenhouse's subject complaints were not fully credible.

The ALJ found that although Rittenhouse cannot return to her past relevant work as a seamstress, she could made a successful adjustment to other work that exists in significant numbers in the national economy. He relied on the VE's testimony in citing examples of parking lot attendant and cashier II. Because he found Rittenhouse retains the residual functional capacity to work, the ALJ found that Rittenhouse was not under a disability through the date of his decision.

### *Disability Determinations and the Burden of Proof*

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the

claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(I).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 708 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987); *id.* at 158, 107 S. Ct. at 2300 (O'Connor, J., concurring); 20 C.F.R. § 404.1521(a)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra.*

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving

Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *See Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page*, 484 F.3d at 1042 (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this

standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion.") (quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1997)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221

F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort, or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)       the claimant's daily activities;

> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

739 F.2d 1320, 1322 (8th Cir. 1984); a*ccord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## *Discussion*

Rittenhouse argues the ALJ erred in finding that the record does not contain objective clinical findings supporting her impairments, and in failing to give appropriate weight to the FCE results. She also argues the ALJ erred in failing to give appropriate weight to Dr. Anderson's opinion that she suffers from depression.

The Commissioner argues substantial evidence supports the weight the ALJ gave to all of the record evidence in arriving at Rittenhouse's residual functional capacity, and in assessing her credibility. He further argues the ALJ properly determined that Rittenhouse's depression is non-severe.

Addressing the last argument first, the court agrees the record does not contain substantial evidence that Rittenhouse's depression is a severe impairment. She has never sought treatment from a mental health professional, and although she sometimes feels depressed about her condition, the evidence does not support a finding that her depression is a severe impairment that has more than a minimal impact on her mental ability to perform basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a); *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007).

With regard to the results of the FCE, the ALJ found that the FCE evaluator's comment regarding Rittenhouse's inability to perform repetitive work was based on Rittenhouse's subjective complaints, and was belied by the actual test results. The ALJ further noted that the FCE evaluator found Rittenhouse could perform work at the sedentary light physical demand level for work above the waist, and the medium light physical demand level for work below the waist. Even if the ALJ had given great weight to the FCE evaluator's conclusion that Rittenhouse could not perform repetitive work, that would not affect the conclusion that Rittenhouse can perform jobs that exist in significant numbers in the national economy. The examples given by the VE of sales clerk or parking lot attendant would fit within the parameters of the FCE evaluation, and neither would require frequent repetitive motion. The court finds the ALJ gave appropriate weight to the results of the FCE and the evaluator's comments.

This case really rises and falls on Rittenhouse's credibility. Both the ALJ and the VE agree that if her subjective complaints are found to be fully credible, Rittenhouse would be unable to work. In finding her testimony not to be fully credible, the ALJ cited numerous inconsistencies between her testimony and the objective evidence of record. The court cannot find support in the record to overturn the ALJ's assessment of Rittenhouse's credibility. As the ALJ pointed out, both Dr. Hunziker and Dr. Stafford frequently noted that Rittenhouse was doing well on her current medications, and Rittenhouse's self-reports to her doctors indicated she was getting along well, sometimes even extremely well. The question is whether her subjective complaints are consistent with the record as a whole. The ALJ concluded they were not. Even though there is *some* evidence in the record that might support an opposite conclusion, the court may not reverse the Commissioner's decision on that basis. *See Goff*, 421 F.3d at 789. Rather, the court may reverse only if the record does not contain substantial evidence to support the ALJ's decision. In this

case, substantial evidence in the record supports the ALJ's decision that Rittenhouse retains the capacity to work.

Accordingly, the Commissioner's decision is **affirmed**, and judgment will be entered in favor of the Commissioner and against Rittenhouse.

**IT IS SO ORDERED.**

**DATED** this 4th day of March, 2011.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT